SCHOOL COMMITTEE OF THE CITY OF PAWTUCKET *vs.*

ZONING BOARD OF REVIEW OF THE CITY OF PAWTUCKET.

JULY 17, 1957.

PRESENT: Flynn, C. J., Condon, Roberts, Andrews and Paolino, JJ.

ANDREWS, J. This is a petition for certiorari brought under general laws 1938, chapter 342, §8, to review a decision of the zoning board of review of the city of Pawtucket, now called the board of appeals by the city charter, granting the application of the Fairlawn Realty Co. for an

exception or variation under the zoning ordinance so as to permit the use of certain premises for a supermarket, drugstore and bank. The respondent board, pursuant to the writ, has certified to this court all the records that are pertinent to the proceeding and decision.

The property in question is a vacant lot on the easterly side of Newport avenue having a frontage of 200 feet on that avenue and running back 350 feet. It contains 70,000 square feet and is located in a residence B district. On the westerly side of Newport avenue, opposite the property, is the J. C. Potter Elementary School and diagonally across the street is the L. C. Goff Junior High School. These two schools have a total enrollment of some 1850 students.

The school committee introduced in evidence before the board a great many letters of protest. The following is a typical one.

"February 6, 1956.

Pawtucket School Committee
School Administration Bldg.
Pawt., R. I.

Gentlemen:

We urge you to protest the sale of the lot opposite the J. C. Potter School known as 999 Newport Ave. L. C. Goff Junior High School and J. C. Potter School have used this land as a playground for a great many years. Also the Cub Scouts, Boy Scouts and School Teams use this playground and to build on this property would both create a safety problem for the school children and would deprive the Youth of Darlington of a playground. This land should and must be bought by the City of Pawtucket.

Respectfully yours,
J. C. Potter PTA"

Most of the remonstrants who spoke at the hearing expressed the same view. The city council unanimously voted to request the board to deny the permit. These remonstrants

and the members of the city council apparently do not fully appreciate that this property is privately owned and that the owner thereof could not be denied relief merely because the children in the neighborhood would lose the free use of it. If the city of Pawtucket wants the land for a playground it should buy it. The only proper objection expressed in the letters or by the remonstrants who appeared at the hearing was to the effect that the proposed structure would increase the traffic hazard.

Leo V. Boyle, a Pawtucket realtor, testified to the effect that on the easterly side of Newport avenue south of the applicant's lot and north of Armistice Boulevard only three fifty-foot house lots are presently used for residential purposes; that the area is about 7 per cent residential use and 93 per cent commercial or public use; and that the granting of the application would not increase traffic hazards but on the contrary "would set as a 'buffer' to decrease" the hazard. He further testified that the granting of the application would not adversely affect property values in the vicinity.

After the hearing the board visited the premises and in its decision noted:

"1. That the character of the surrounding property on the easterly side of Newport Avenue, is generally commercial, industrial, public buildings, and non-residential.
2. The land in question is not suitable for residential purposes.
3. The granting of this application with the restrictions set forth in this decision would not create a traffic hazard at this point, and would not be detrimental to the safety of the neighborhood."

The board finally concluded:

"(1) That the land in question is not suitable for any of the uses permitted in a residential 'B' district.
(2) That the proposed use with proper restrictions. would not create a traffic hazard in this vicinity,

and more specifically would not cause any additional hazards to the local school children.

(3) That the proposed use would be in harmony with the character of the neighborhood and appropriate to the uses of buildings permitted in such district, and possessive of a reasonable tendency towards promoting the public convenience.

(4) That the literal enforcement of the ordinance would result in unnecessary hardship to the applicant.

(5) That the proposed use would not depreciate the surrounding property values.

\* \* \*

(8) That to deny the application would be tantamount to depriving the applicant of a legal appropriate and legitimate use of its premises and permit further gratuitous use of the area for public purposes at the expense of the applicant."

It then attached restrictions to the permit with which no one has found fault.

The application was for an exception or a variance. The applicant relied upon §26.18 of the zoning ordinance relative to exceptions although he referred to only part of it. The pertinent provisions thereof read as follows:

"(8) Approve in any district an application for any use or building which the board of review finds:

(a) To be in harmony with the character of the neighborhood, appropriate to the use or buildings permitted in such district, and possessive of a reasonable tendency towards promoting the public convenience, the public welfare or the public health;

(b) Where such use or building is reasonably necessary for the convenience or welfare of the public

\* \* \* "

The proper construction of paragraphs (a) and (b) is not entirely clear, but as far as this case is concerned there is no evidence warranting a finding that the proposed use was "possessive of a reasonable tendency towards promoting

the public convenience, the public welfare or the public health." Nor is there any evidence to support a finding that said use is "reasonably necessary for the convenience or welfare of the public * * *." Such being the case, we cannot sustain the granting of the permit as an exception.

We shall now consider whether there was any evidence to support the finding of a variance. Here again the board made its finding in proper language. As far as appears, this land has always been vacant. In view of the great increase in home building in the last several years, it would seem that this property would have been used for homes by this time had it been suitable therefor. The board noted that the purchase price was $65,000, which is almost $1 a square foot. The school board pointed out that the land would make fourteen lots 50 by 100 feet, which would mean that the minimum price for these lots would be practically $5,000 each. Therefore, with this price for a lot, a rather expensive house would have to be built on it. When this is coupled with the fact that the land is surrounded by business and industrial properties and two schools with some 1850 children in attendance, we cannot say that there was no evidence to warrant the conclusion of the board "that the land in question is not suitable for residential purposes."

The other uses to which this property could be put under the present zoning are:

"(1) Any use permitted in this chapter in any Residence A District.

(2) A detached house for two housekeeping units only, or a semidetached house for two housekeeping units only.

(3) An apartment house, boardinghouse or hotel, as defined in chapter 3 of this Revision relative to buildings. There shall be no display advertising exhibited except a small announcement sign on the building, and no public restaurant or dining room except as an accessory use.

(4) A gasoline filling station or a stable, if approved by the board of review.

(5) An airplane landing field, airship hangar and accessory buildings, if approved by the board of review."

The reasons that militate against the use of this property for residences apply with almost equal force to most of these uses and any of them would probably be no less objectionable to petitioner than the proposed use.

The petitioner points out that the applicant bought the property the day it filed the application and if it suffers any hardship it is of its own creation. There is no merit in this contention. The zoning law deals with the use of land. The time when the land was acquired is not pertinent in determining its proper use. We cannot say that there was no evidence to warrant the conclusion of the board that to refuse the application would create an unnecessary hardship upon the owner of this land, nor can we say that the refusal of the variance was required by the general scheme of the ordinance.

We have had occasion heretofore to criticize the respondent board for failing to base some of its decisions on the record before it, so we deem it appropriate at this time to commend it for confining its decision to the true merits of the instant controversy when it stated: "That objections to the effect that the land had been used for many years as a playground are irrelevant to the matter under consideration."

The petition for certiorari is denied and dismissed, the writ heretofore issued is quashed, and the papers in the case which have been certified to this court are ordered returned to the board.

FLYNN, C. J., did not participate in the decision.

*William E. Powers,* Atty. Gen., *Archie Smith,* Ass't Atty. Gen., for petitioner.

*John A. O'Neill,* City Solicitor, *Harvey J. Ryan,* Ass't City Solicitor, for respondent.

*Woolley, Blais & Quinn, John F. Quinn,* for applicant.